IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

STEPHEN LIEBB,

        Petitioner,

   v.

R. AYERS JR.,

        Respondent.

_____/

No. C 08-02643 CW

ORDER GRANTING
PETITION FOR WRIT OF
HABEAS CORPUS

On May 27, 2008, Petitioner Stephen Liebb, proceeding pro se,
filed the present petition for a writ of habeas corpus pursuant to
title 28 U.S.C. § 2254, challenging as a violation of his
constitutional rights a denial of parole by the Board of Parole
Hearings (Board) on September 26, 2007.[1]  Respondent has filed an
answer.  Petitioner, now represented by counsel, has filed a
traverse.  Having considered all of the papers filed by the
parties, the Court grants the petition.

BACKGROUND

    A Los Angeles County jury found Petitioner guilty of first
degree murder with the use of a deadly weapon (a knife) in
violation of California Penal Code §§ 187 and 12022(b) (Count 1).
The jury also found Petitioner guilty of assault with a deadly
weapon in violation of California Penal Code § 245 (Count 2).  The

---

[1]Petitioner also challenges the Board's decision to deny
parole for two years.  In light of the fact that the Court grants
the petition for a writ of habeas corpus, it does not address this
claim.

United States District Court
For the Northern District of California

court sentenced Petitioner to twenty-five years to life in prison for the murder, plus a one year enhancement for the use of a knife, and a concurrent sentence of three years in prison for the assault. Petitioner's minimum eligible parole date was January 14, 1997.

On September 26, 2007, Petitioner was found unsuitable for parole for the fifth time,[2] for a two-year period. Pet'r Ex. E, Transcript of September 26, 2007 Board Hearing (Tr.) at 212. On December 5, 2007, Petitioner filed, in the California superior court, a petition for a writ of habeas corpus challenging the Board's 2007 parole suitability decision. Resp't Ex. 1. On February 5, 2008, in a reasoned decision, the superior court denied the petition. Resp't Ex. 2. Petitioner then filed a petition for a writ of habeas corpus in the California court of appeal. Resp't Ex. 3. The court of appeal summarily denied the petition on March 5, 2008. Resp't Ex. 4. Petitioner then filed a petition for review in the California Supreme Court, which summarily denied it on March 14, 2008. Resp't Exs. 5 and 6.

At Petitioner's 2007 parole suitability hearing, the Board described the facts of the murder and assault, which it took from the appellate court decision on direct appeal. To summarize, Petitioner became embroiled in a series of business disputes with the family and friends of the victim, Michael Diller. He assaulted Joe Gold, a friend of the family, hitting him fifteen times on the head with a bat. He also hit Michael Diller's brother, Arthur.

---

[2] The Board found Petitioner unsuitable for parole in 1996, 2000, 2003 and 2006. Petitioner challenged the 2003 parole denial in Liebb v. Brown, 04-4213 CW, and his petition was denied by this Court. Petitioner filed a pro se petition challenging the 2006 parole denial in Liebb v. Ayers, 07-5577 CW. This case is pending.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Later, in a telephone call with the Diller brothers' mother, he threatened the Diller family.  The next morning, Arthur confronted Petitioner.  They fought, and Petitioner hit Arthur with a pipe, breaking his nose and causing injuries requiring stitches.  Subsequently, Petitioner confronted Michael Diller, who was in a car with a female friend.  Petitioner grabbed the car door, pulled it open before Michael's friend could close it, jumped on the friend's lap and hit her and Michael.  Michael accelerated the car and Petitioner grabbed the wheel, causing the car to crash into a building.  After the crash, Michael jumped out of the driver's side and ran towards a park, with Petitioner chasing him.  Michael ran to the park office and dove through a half-open window.  Petitioner lay on the window sill of the park office, facing Michael.  Petitioner had a knife, and Michael grabbed it, cutting his hand.  Petitioner pulled the knife away from Michael, stabbed him in the chest and then ran.  Michael died shortly thereafter.  The deputy medical examiner testified that Michael died of loss of blood and a stab wound through his lung and heart.  The knife, a three-and-three-quarter-inch blade, had been given a hard thrust and twisted inside Michael's chest.

Petitioner explained to the Board his version of the events that led to the commitment offense.  He said that he "was making bad decisions. . . . And I was just angry, you know, at everything that was happening. . . . without expressing it to anybody . . . I guess I wanted more understanding."  Tr. at 42.  Petitioner assumed that, because he had made a derogatory remark about Arthur Diller's sister, Arthur would be coming after him.  Tr. at 48-49.  Arthur did come for Petitioner with a pipe, but Petitioner was able to

pull it away from him and he hit Arthur with his fist.  Tr. at 49.

After the incidents with Joe Gold and Arthur Diller, Petitioner expected to have "problems" so he bought a knife from a sporting goods store.  Tr. at 51.  On the day of the homicide, Petitioner was riding his motorcycle and saw Michael Diller driving his car.  Tr. at 53.  Petitioner didn't "want this thing to keep going on because I just got anxiety . . . and if they're coming after me. . . . I wanted to confront him with this because I wrongly blamed him for, what I realize today, and what I didn't realize then [inaudible] that I blamed him for the pain I was feeling and my anger."  Tr. at 56.  Petitioner really wasn't thinking when he jumped into Michael's car on top of the girl and grabbed the steering wheel.  Tr. at 58.  Petitioner didn't intend to kill Michael when he stabbed him.  Tr. at 59.

The Board considered the following facts regarding Petitioner's background before and after he was incarcerated.

Petitioner grew up in a supportive, loving, middle-class family and has four siblings.  Pet's Ex. H, September 7, 2007 Psychological Report by Dr. Kristin Hibbard, Ph.D, Clinical Forensic Psychologist (Hibbard Rep't) at 3.  His family was Orthodox Jewish and very strictly followed those religious beliefs. Id.  Prior to his incarceration, Petitioner earned a bachelor of arts degree and a law degree and passed the California bar examination.  Id.  He then joined a law firm and was working as an attorney at the time of the commitment offense.  Id.  He spent most of his free time involved in physical activities such as body building and running marathons.  Id.  He had never been arrested prior to the commitment offense.  Id.  He has no record of alcohol

4

or drug abuse or mental health problems.  Id. at 3, 5.

Petitioner's disciplinary history while incarcerated consisted of two rules violation reports (CDC-115) and one disciplinary memo (CDC-128A).  Tr. at 97-98.  A CDC-115 was issued on July 7, 1990 for refusing to work for religious reasons.  Id.  The second CDC-115 was issued on March 26, 1989 for fighting with another inmate.  Id.  His CDC-128A was issued on June 22, 1991, also for refusing to work for religious reasons.  Tr. at 98.

In the previous Board decision, issued on July 27, 2006, it had found that, although Petitioner had "programmed extremely well," he had not been involved with self-help programs until three years before the hearing.  The Board advised him to "remain discipline-free, continue to participate in self-help, and continue to go the routes that you're going right now."  Pet's Ex. E, Transcript of July, 2006 Decision at 2-4.  At the 2007 hearing, the Board noted that, since the 2006 hearing, Petitioner had participated in self-help programs including the IMPACT program, yoga, the Friends Outside parenting class and non-violent communication classes.  Tr. at 75-77.  It also noted that, starting in 1985, he had taken self-help classes in subjects such as parenting, insight and meditation, yoga, men's ethics and creative conflict resolution.  Tr. at 75-76, 82-83.  Petitioner also took academic classes through Patten College in English, biology, business, literature, electronics, economics, Spanish and paralegal studies.  Tr. at 82.  He completed the paralegal program and received a certificate.  Tr. at 82.  Beginning in 1984, Petitioner received many laudatory chronos and letters from correctional officers, teachers, and chaplains.  Tr. at 76, 82-83.

United States District Court
For the Northern District of California

The Board reviewed several psychological evaluations of Petitioner.  It quoted from a July 20, 2006[3] psycho-social assessment by psychologist Michel Lynn Inaba, Ph.D, which noted that Petitioner had insight into the external forces that were operating at the time of the offense, but had less understanding of the internal dynamics that contributed to the murder.  Tr. at 86. Dr. Inaba also noted that Petitioner expressed remorse for his crime and had "some insight into the attitudes and behavior that led to his crime.  He acknowledges that he was the aggressor in the killing and that his victim had not threatened him in any way." Tr. at 86-87.  Dr. Inaba opined that the actuarial probability that Petitioner would engage in violence again was low.  Tr. at 91.  Dr. Inaba noted that Petitioner did not have any record of violence prior to the murder and the violent incidents that preceded it, and that Petitioner had not received a rules violation in the prison since 1991.  Dr. Inaba concluded, "If released to the community, there is no reason to believe that his risk for future violence would be greater than that of the average parolee.  He has the means to support himself in the community without resorting to criminal behavior.  Mr. Liebb has job skills, a history of good work performance and supportive family members.  He's willing to comply with all conditions of parole. . . . Given that there is no clear motivation for Mr. Liebb's unprovoked pursuit and stabbing of the victim, it would be beneficial for Mr. Liebb to obtain therapy to further explore the reasons for the fatal assault as well as other instances of assaultive behavior. . . . He has gained a sense

---

[3]It appears that the Board misstated the date of this report as July 20, 2004.

United States District Court
For the Northern District of California

of purpose while incarcerated by assisting other inmates with legal matters.  He also uses writing as a means of self-expression.  It would appear that he is better able to tolerate insults, has a better sense of who he is, and is more sensitive to the needs of others."  Tr. at 93-94.

The Board reviewed the September 7, 2007 report of Dr. Kristin Hibbard, which concluded that "the inmate presents as a very low risk of recidivism or risk to participate in any anti-social or criminal behavior in the future.  Risk factors that would lead to an anti-social, criminal, or dangerous behavior are virtually absent.  In summary, Mr. Liebb is an unusually stable and level-headed individual who is dedicated strongly to his spirituality. It is highly unlikely that he would encounter any difficulties within the community that he is not equipped to handle, nor is there any evidence historically of any anti-social behavior prior to the encapsulated time period surrounding his crime.  The tools and insight that he has gained, as well as the person he is, give him ample coping skills. . . .  It is strongly recommend [sic] that he be considered for release into the community. . . "  Tr. at 98-99.

The Board reviewed Petitioner's parole plans.  It noted that he had been accepted into the San Francisco Muslim Community Center supportive living program with services that include room and board, residential treatment, job referrals, substance abuse programs and cognitive restructuring workshops.  Tr. at 114. Petitioner had offers of employment as a paralegal in a private law firm and with the California Prison Focus program.  Tr. at 115. The Board noted that Petitioner had accomplished all the

United States District Court
For the Northern District of California

suggestions given by the 2006 Board that had denied parole, in that he had remained discipline-free and had continued with self-help programs including non-violent communication and yoga.  Tr. at 131-35.

The Board also noted that the Beverly Hills police department was opposed to Petitioner being found suitable for parole.  Tr. at 126.  The deputy district attorney who prosecuted Petitioner made a statement opposing parole.  Tr. at 140-61.  Arthur Diller, the victim's brother, made an impassioned plea against Petitioner's parole.  Tr. at 173-94.

The Board found that Petitioner was unsuitable for parole because he would pose an unreasonable risk of danger to society if released from prison.  Tr. at 195.  The Board primarily relied upon its finding that the commitment offense was carried out in an especially cruel and callous manner.  Tr. at 196.  The psychological reports were of "grave concern" to the Board.  Tr. at 198.  The Board cited a 1992 psychological report by senior psychiatrist Marjorie Tavoularis, which concluded that Petitioner's potential for violence was above average and that he had a potential for predatory violence.  Tr. at 203.  The Board cited Dr. Inaba's 2006 report that Petitioner had insight into the external, but not the internal forces that contributed to the commitment offense.  Tr. at 204.[4]

---

[4]In a separate decision, the Board found it not reasonable to expect that parole would be granted for two more years.  Tr. at 199.  For this decision, the Board relied on its finding that Petitioner was emotional when discussing the losses of his family members, but displayed a "very dry affect" with respect to the victim and his family.  Tr. at 202.  By dry affect, the Board meant
(continued...)

8

The Board found that Petitioner had only recently stepped up participation in self-help programs.  It concluded that he needed to participate in more self-help and to continue to read, and that he would benefit from some therapy, even though it was aware that therapy was limited in the institutional setting in which Petitioner was incarcerated.  Tr. at 212.

The state habeas court, in a two-page opinion, affirmed the Board's decision, acknowledging that the Board based its decision primarily on the commitment offense.  Resp't Ex. 2 at 1.  The court found that there was some evidence to support the Board's finding that Petitioner presents an unreasonable risk of danger to society and is unsuitable for parole.  Id.  The court also found some evidence to support the Board's finding that the commitment offense was carried out in a dispassionate and calculated manner, that the

_____

[4](...continued)
that Petitioner said the right words, but displayed little emotion. Tr. at 202.  The Board was concerned whether Petitioner was being honest and noted that "there is still some resistance on your part [ ] to actually discuss this crime in terms of what this really was, and that calls into question if you do understand the nature and magnitude of this crime."  Tr. at 202.  The Board also was concerned that, in his discussion of the circumstances leading up to the commitment offense, Petitioner did not describe his relationships with some of the major players nor did he describe his relationships with women or his mother, although the Board noted that it had not questioned him about this area of his life. Tr. at 204.  The Board was also concerned with the fact that Petitioner's description of the stabbing was non-emotional and clinical and that it was hard to believe Petitioner's description that the victim grabbed the knife with his hand; the Board felt the wounds on the victim's hands were defensive wounds he received when he was trying to protect himself from being stabbed.  Tr. at 205. The Board found that Petitioner's statement to the victim after the stabbing, that "I never did anything to you or your family," was outrageous.  Tr. at 205.  The Board also found unbelievable Petitioner's statement that he was not aware that the wound he inflicted on the victim was fatal.  Tr. at 206.  The Board also highlighted Dr. Inaba's comment that Petitioner would benefit from therapy to explore the reasons for his assaultive behavior because there is no clear motivation for Petitioner's attack.  Id.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

crime was premeditated, that the motive for the crime--business disputes with the victim's family--was trivial in relation to the offense. <u>Id.</u> at 1-2.  The court also noted that Petitioner had one Rule 115 violation that involved violence while he was in prison. <u>Id.</u> at 2.

DISCUSSION

I. Standard of Review

Because this case involves a federal habeas corpus challenge to a state parole eligibility decision, the applicable standard is contained in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  <u>McQuillion v. Duncan</u>, 306 F.3d 895, 901 (9th Cir. 2002).

Under AEDPA, a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000).  A federal court must presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1).

In determining whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision.  <u>LaJoie v. Thompson</u>, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  Here, the highest state court to address the merits of

1   Petitioner's claim is the superior court.

2   II. Analysis

3        Petitioner argues that he was deprived of due process because

4   (1) the Board and the superior court applied an erroneous standard

5   of parole suitability and (2) the parole denial was not supported

6   by any evidence of current dangerousness.  Respondent argues that

7   (1) there is no federally protected liberty interest in parole, and

8   thus Petitioner has not stated a federal question invoking this

9   Court's jurisdiction, (2) even if there is a federal liberty

10  interest in parole, under Greenholtz v. Inmates of Neb. Penal Corr.

11  Complex, 442 U.S. 1, 16 (1979), Petitioner received all due process

12  to which he is entitled, and (3) even if the "some evidence"

13  standard of review applies, the Board and superior court decisions

14  were supported by some evidence that Petitioner remained a danger

15  to public safety.

16       The United States Supreme Court has clearly established that a

17  parole board's decision deprives a prisoner of due process with

18  respect to his constitutionally protected liberty interest in a

19  parole release date if the board's decision is not supported by

20  "some evidence in the record," or is "otherwise arbitrary."  Sass

21  v. California Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir.

22  2006) (citing Superintendent v. Hill, 472 U.S. 445, 457 (1985)).

23       In his argument that California inmates do not have a

24  federally protected liberty interest in parole release, Respondent

25  claims that the Ninth Circuit's holding to the contrary in Sass is

26  not clearly established federal law for the purposes of AEDPA.

27  However, this Court is bound by Ninth Circuit authority.  See also,

28  Irons v. Carey, 505 F.3d 846, 850 (9th Cir. 2007) (all California

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

prisoners whose sentences provide for the possibility of parole are vested with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause); McQuillion v. Duncan, 306 F.3d 895, 898 (9th Cir. 2002) ("under clearly established Supreme Court precedent, the parole scheme in California . . .[gives] rise to a constitutionally protected liberty interest").  Therefore, Respondent's argument that there is no liberty interest in parole fails.

Citing Greenholtz, 442 U.S. at 16, Respondent argues that, because due process only entitles Petitioner to an opportunity to present his case and an explanation of why the Board denied parole, Petitioner received all process due in the parole context under federal law.  In Sass, the Ninth Circuit directly addressed this argument, holding that the minimal "some evidence" standard announced in Hill, 472 U.S. at 457, applies in the parole context, reasoning that "to hold that less than the some evidence standard is required would violate clearly established federal law because it would mean that a state could interfere with a liberty interest --that in parole--without support or in an otherwise arbitrary manner."  Sass, 461 F.3d at 1129.  Greenholtz predates Sass, and the Ninth Circuit was aware of Greenholtz when it held that the "some evidence" standard applies to parole board decisions.  Therefore, Respondent's argument based on Greenholtz fails.

When assessing whether a state parole board's suitability determination was supported by "some evidence," the court's analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state.  Id. at 1128;

Irons v. Carey, 505 F.3d 846, 851 (9th Cir. 2007).  Accordingly, in California, the court must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record to determine whether the state court decision constituted an unreasonable application of the "some evidence" principle.  Sass, 461 F.3d at 1128; Irons, 505 F.3d at 851.

California law provides that a parole date is to be granted unless it is determined "that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration . . . ."  Cal. Penal Code § 3041(b).

The California Code of Regulations (CCR) sets out the factors showing suitability or unsuitability for parole that the Board is required to consider.  See CCR tit. 15, § 2402.[5]  These include "[a]ll relevant, reliable information available," such as,

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in finding of unsuitability.

CCR § 2402(b).

Circumstances tending to show unsuitability for parole include

---

[5]All references to California regulations are to title 15.

13

United States District Court
For the Northern District of California

the nature of the commitment offense and whether "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner."  CCR § 2402(c).  This includes consideration of the number of victims, whether "[t]he offense was carried out in a dispassionate and calculated manner," whether the victim was "abused, defiled or mutilated during or after the offense," whether "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense."  Id.  Other circumstances tending to show unsuitability for parole are a previous record of violence, an unstable social history, previous sadistic sexual offenses, a history of severe mental health problems related to the offense, and serious misconduct in prison or jail.  Id.

Circumstances tending to support a finding of suitability for parole include no juvenile record, a stable social history, signs of remorse, that the crime was committed as a result of significant stress in the prisoner's life, battered woman syndrome, a lack of criminal history, a reduced possibility of recidivism due to the prisoner's present age, that the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release, and that the prisoner's institutional activities indicate an enhanced ability to function within the law upon release.  CCR § 2402(d).  The California Supreme Court stated that due process is denied when "an inquiry focuse[s] only upon the existence of unsuitability factors."  In re Lawrence, 44 Cal. 4th 1181, 1208 (2008).  In Lawrence, the court reiterated "our conclusion that current dangerousness (rather than the mere

14

United States District Court
For the Northern District of California

presence of a statutory unsuitability factor) is the focus of the parole [suitability] decision . . . ."  Id. at 1210.  The decision denying parole must establish a rational nexus between the relevant factors "and the necessary basis for the ultimate decision--the determination of current dangerousness."  Id.  The court explained that

> the statutory and regulatory mandate to normally grant parole to life prisoners who have committed murder means that, particularly after these prisoners have served their suggested base terms, the underlying circumstances of the commitment offense alone rarely will provide a valid basis for denying parole when there is strong evidence of rehabilitation and no other evidence of current dangerousness.

Id. at 1211.[6]

A. Continued Reliance on Commitment Offense

Petitioner argues that the Board's continued reliance on his commitment offense to find him unsuitable for parole, in light of his exemplary behavior and evidence of rehabilitation, violated his due process rights.  In Biggs v. Terhune and Sass, the Ninth Circuit discussed the effect of continued denials of parole based solely on unchanging factors such as the commitment offense and prior criminal history.  See Biggs v. Terhune, 334 F.3d 910, 917 (9th Cir. 2003); Sass, 461 F.3d at 1129.  In Biggs, the court, in dicta, stated that "continued reliance in the future on an

_____

[6]In his reply, Petitioner contends that the petition should be granted because the Board and the superior court applied an erroneous standard of review in that their decisions were issued before the California Supreme Court decided Lawrence.  Because this argument was presented only in Petitioner's reply, Respondent has not had an opportunity to respond to it.  However, the Court need not address it because, as discussed below, under the pre-Lawrence some evidence standard of review, the Court finds that the superior court's decision was an unreasonable application of Supreme Court authority.

**United States District Court**
For the Northern District of California

unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." <u>Biggs</u>, 334 F.3d at 917.  The Ninth Circuit's opinion in <u>Irons</u> sheds further light on whether reliance on an immutable factor such as the commitment offense violates due process.  505 F.3d at 850.  In <u>Irons</u>, the District Court for the Eastern District of California granted a habeas petition challenging the parole board's fifth denial of parole where the petitioner had served sixteen years of a seventeen-years-to-life sentence for second degree murder with a two-year enhancement for use of a firearm, and where all factors indicated suitability for parole; however, the Ninth Circuit reversed.  358 F. Supp. 2d 936, 947 (E.D. Cal. 2005), <u>rev'd</u>, 505 F.3d 846 (9th Cir. 2007).  The Ninth Circuit limited its holding to inmates deemed unsuitable prior to the expiration of their minimum sentences and left the door open for inmates deemed unsuitable after the expiration of their minimum sentences.  505 F.3d at 854.  The Ninth Circuit stated:

> We note that in all the cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence.  Specifically, in <u>Biggs</u>, <u>Sass</u>, and here, the petitioners had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board. <u>Biggs</u>, 334 F.3d at 912; <u>Sass</u>, 461 F.3d at 1125.  All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms.

<u>Id.</u> at 853-54.  The court recognized that at some point after an inmate has served his minimum sentence, the probative value of his

**United States District Court**
For the Northern District of California

commitment offense as an indicator of an unreasonable risk of danger to society recedes below the "some evidence" required by due process to support a denial of parole. Id.  The California Supreme Court is in accord that "the circumstance that the offense is aggravated does not, in every case, provide evidence that the inmate is a current threat to public safety.  Indeed, it is not the circumstance that the crime is particularly egregious that makes a prisoner unsuitable for parole--it is the implication concerning future dangerousness that derives from the prisoner having committed that crime." Lawrence, 44 Cal. 4th at 1214.

Petitioner received a twenty-six years to life sentence and he had been in custody since his arrest on July 12, 1981, a total of twenty-six years and two and one-half months at the time of the hearing before the Board.  Therefore, unlike Biggs, Sass and Irons, Petitioner had served more than his minimum twenty-six-year sentence.

B. Rule 115 Violation Involving Violence

The state court also noted the Board's finding that, in 1989, Petitioner had received a Rule 115 violation involving violence and that the deputy district attorney had opposed Petitioner's release. Citing California Penal Code § 3042[7], the court noted that the Board could not rely on these factors, but that they may be properly considered.  However, although the Board mentioned the 1989 violation, it noted that Petitioner's record was violence-free since then and that he had turned his behavior around.  Tr. at 198.

[7]The court cited California Penal Code § 3402.  Because § 3402 applies to record-keeping for inmates, the court must have cited it in error and most likely meant to cite Penal Code § 3042 which applies to parole review hearings.

United States District Court
For the Northern District of California

Therefore, it does not appear that the Board considered the eighteen-year old rule violation as evidence of Petitioner's danger to the public if released on parole.

C. Factors Establishing Suitability

Petitioner's psychological reports indicate that he poses a low risk of engaging in violent behavior if released on parole. The most recent psychological report by Dr. Hibbard indicated that Petitioner poses a very low risk of recidivism or of engaging in violent behavior in the future.  Hibbard Rep't at 11.  Dr. Inaba's 2006 report noted that Petitioner presented a low risk of violence in a controlled environment and the risk for violence if he were released into the community was not greater than the average parolee.  2006 Inaba Rep't at 6.  Also, the July, 2006 Life Prisoner Evaluation Report, written by Correctional Counselors V. Zanni, V. Kelley and C. Belshaw, indicated that: (1) Petitioner expressed remorse for the death of his friend and took responsibility for his crime; (2) Petitioner wrote a lengthy letter dated December 25, 2002, that sheds light on the events leading up to the crime; (3) Petitioner has very favorable work reports and support letters from staff indicating that they feel he is a good candidate for parole; (4) Petitioner has remained discipline-free since 1991; (5) Petitioner has become more involved in self-help and educational programs since his last appearance before the Board; (6) Petitioner has numerous support letters from churches, former professors and various community members who knew him before he came to prison, are supportive of his release and have offered to provide various levels of support; and (7) Petitioner has a strong educational background which will help him in obtaining

18

**United States District Court**
For the Northern District of California

employment.  Pet'r Ex. B.  The July, 2007 Life Prisoner Evaluation Report, written by Correctional Counselors V. Zanni, S. Robinson and D. Trumpy, indicated that everything remained the same as in the previous report, updated Petitioner's therapy and self-help activities, laudatory chronos and academic achievements and noted that he had three offers of employment and a strong support system with many people offering to provide him with any kind of help that he may need.  Pet'r Ex. C.  In May, 2007, Drs. Steven Walker, Senior Psychologist for the Board, and Jasmine Tehrani, an independent psychologist, reviewed Dr. Inaba's 2006 report and the 2007 Life Prisoner Evaluation Report and concluded that "the opinions rendered in Dr. Inaba's report, including diagnosis and violence risk potential, appear well supported and flow directly from the data."  Pet'r Ex. G.  Drs. Walker and Tehrani noted that, based on the Life Prisoner Evaluation Report, in the year after Dr. Inaba's report, Petitioner continued to participate in self-help programming, received seven laudatory chronos, and was free of any disciplinary violations.  Id.

Also significant is the fact that several correctional officers, some who have never before supported an inmate for parole, have written letters of support for Petitioner.

Furthermore, Petitioner clearly meets all but one of the suitability factors listed in CCR § 2402(d).[8]  Petitioner satisfies CCR §§ 2402(d)(1) and (6) because he has no criminal juvenile record or adult record except for the commitment offense and his attacks on Gold and Arthur Diller leading up to the commitment

---

[8]CCR § 2402(d)(5), battered woman syndrome, does not apply to Petitioner.

**United States District Court**
For the Northern District of California

offense.  Petitioner has a stable social history, expresses signs
of remorse, has made realistic plans for release and has developed
marketable skills that can be put to use upon release and has
participated in institutional activities that indicate an enhanced
ability to function within the law if released.  Additionally,
Petitioner's present age of fifty-one reduces the probability of
recidivism, fulfilling CCR § 2402(d)(7).  There is a dispute only
in regard to whether Petitioner meets CCR § 2402(d)(4), significant
stress as a factor in the commission of the crime.  The
psychological reports seem to agree that the motivation for the
crime remains a mystery.  However, Petitioner told the Board that
he was under a great deal of stress shortly before the commitment
offense because enmity had developed between himself and Arthur
Diller and Arthur Diller's friend Joe Gold, and because Petitioner
felt betrayed by the victim, Michael Diller, his once close friend,
who took Joe Gold's side against Petitioner and did nothing to stop
his brother, Arthur, from attacking Petitioner.

When all factors favor parole and indicate the inmate has been
rehabilitated, continued reliance on unchanging factors such as the
commitment offense may result in a due process violation.  See
Biggs, 334 F.3d at 917.  Here, the commitment offense, and the
violent episodes leading up to it, are immutable facts that
occurred more than twenty-six years before the Board's hearing.
Based on this record, they do not, alone, after this length of
time, constitute "some evidence" that Petitioner currently is a
danger to the public if released on parole.  Therefore, the court's
affirmation of the Board's decision was an unreasonable application
of Supreme Court authority.

**United States District Court**
For the Northern District of California

Respondent argues that the Court should look through the state court's decision to the Board's decision to find that there was some evidence to support the Board's finding that Petitioner was unsuitable for parole.  Notably, Respondent argues that the Board relied on its findings that (1) Petitioner had attacked people on two occasions in addition to the crimes for which he was convicted; (2) Petitioner had threatened and harassed the murder victim's mother; (3) Petitioner only recently began to participate in group self-help programs; (4) Petitioner's psychological reports were troubling; and (5) the victim's brother, the district attorney and the police department argued that Petitioner was unsuitable for parole.  However, the Board's decision likewise does not satisfy the "some evidence" standard.

The Board noted, in reciting the events leading up to Petitioner's commitment offense, that he had attacked Joe Gold and Arthur Diller and that he had harassed Michael Diller's mother.  However, as discussed above, like the commitment offense itself, these events are immutable facts that occurred many years ago and do not, after this length of time, constitute some evidence that Petitioner currently is a danger to the public if released on parole.

The Board noted that Petitioner's "participation in self-help in a group sense has been relatively recent.  We looked at your record, and we saw that you had one self-help therapy in 1999, and then you had the father's program in 2002 and only after that did you then sort of step it up and really participate in group self-help."  Tr. at 197.  However, the Board's conclusion that Petitioner's participation in self-help was only recent is not

**United States District Court**
For the Northern District of California

supported by the record.  First, the Board itself noted that
Petitioner had accomplished all the suggestions given by the 2006
Board that had criticized his lack of participation in programs.
Second, the July, 2006 Life Prisoner Evaluation Report for
Petitioner lists his self-help and therapy activities and indicates
that Petitioner began psychological therapy in 1985, participated
in the father's program in 2002, insight meditation classes in
2003, IMPACT sessions in 2003 through 2005, yoga in 2004 and 2005
and the Friends Outside creative conflict resolution workshops in
2005 and 2006.  Pet'r Ex. B at 11.  This list indicates that
Petitioner participated extensively in self-help programs from 2002
through 2006.  In addition, from 1997 through 2006, Petitioner
enrolled in numerous academic and vocational courses and
successfully completed a three-year paralegal program.  Id. at 7-8.
Petitioner also received what the Board described as "an
exceptional list of laudatory chronos" that extends from 1984
through 2006.  Id. at 8-10.  Thus, Petitioner's participation in
prison programs cannot be characterized as "recent," and this
criticism does not contribute to "some evidence" for the Board's
decision.

The Board relied on the portion of Dr. Tavoularis' 1992
psychological report which indicated that she believed that
Petitioner had a potential for predatory violence and a strong
tendency to hide issues and intellectualize.  Tr. at 203.  The
Board also relied on the portion of Dr. Inaba's 2006 report that
indicated that Petitioner had good insight into the external, but
not the internal, dynamics operating at the time of his offense.
Tr. at 204.

Dr. Tavoularis' report, which was written fifteen years before the Board's hearing, is not evidence of Petitioner's psychological state of mind at the time of the hearing, especially given the many subsequent psychological reports which concluded that Petitioner's risk of violence if released was the same or lower than the average inmate.  Also, the Board over-emphasized Dr. Inaba's remark that Petitioner had less understanding of internal dynamics contributing to the commitment offense, especially in light of Dr. Inaba's positive assessments that Petitioner had gained maturity and insight during his years of incarceration, had gone beyond the identity crisis that caused him to develop a hyper-aggressive persona, and presented a low risk for violent behavior.  Pet'r Ex. D at 4-6.

Therefore, the psychological assessments cited by the Board do not contribute to "some evidence" that Petitioner is currently a danger to the public if released.

The Board also relied on the fact that there was opposition to a finding of parole suitability by the deputy district attorney, the Beverly Hills police department and Arthur Diller.  Tr. at 199.  However, as noted by Petitioner, because opposition to parole is not a factor listed in CCR § 2402(d), the Board could not properly rely on it to support its finding of unsuitability.

CONCLUSION

The commitment offense and the violent incidents that preceded it, which occurred over twenty-six years ago, no longer constitute "some evidence" that Petitioner's release will pose an imminent danger to public safety, in light of Petitioner's violence-free years before and since the attacks and commitment offense, his

United States District Court
For the Northern District of California

lengthy incarceration, his rehabilitation through self-help and education, his realistic plans for parole and his support from community and family members.  The Board's continued reliance on the commitment offense and the preceding attacks violated Petitioner's due process rights, and the state court's affirmation of the Board's denial was unreasonable in light of the facts and an unreasonable application of United States Supreme Court law. Accordingly, Petitioner's petition for a writ of habeas corpus is granted.  The Board shall hold a new parole hearing within sixty (60) days from the date of this order and reevaluate Petitioner's suitability for parole in accordance with this order.  If the Board finds Petitioner suitable for parole and sets a release date and the Governor does not reverse, the Court will stay Petitioner's actual release for two weeks to allow Respondent to request a stay pending appeal from this Court and, if necessary, from the Court of Appeals.  The Court retains jurisdiction to review compliance with its order.

The Clerk of the Court shall terminate all pending motions, enter judgment and close the file.  Each party shall bear his own costs.

IT IS SO ORDERED.


Dated: December 2, 2009                    _____
                                           CLAUDIA WILKEN
                                           United States District Judge